UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MILEK MIMS,

    Defendant.

_____/

Case No. 20-20323

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 45)**

Defendant Milek Mims is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), based on the Detroit Police Department's (DPD's) recovery of a firearm on Mims's person. Mims filed a motion to suppress evidence of the firearm seized from him (Dkt. 45). The Government filed a response (Dkt 48), and Mims filed a reply (Dkt. 51). The Court held an evidentiary hearing at which DPD Officers Jason Lord and David James testified to events relating to their seizure of the firearm. See Trans. (Dkt. 55). The Government and Mims each filed supplemental briefs proposing findings of fact and conclusions of law based on the evidentiary hearing. See Gov. Suppl. Br (Dkt. 56); Mims Suppl. Br. (Dkt. 57). On the basis of the parties' briefing and testimony at the evidentiary hearing, the Court denies Mims's motion to suppress.

**I. BACKGROUND**

At the evidentiary hearing, Officers Lord and James testified that, on the day they seized a firearm from Mims, they were looking for a suspect involved in a non-fatal shooting in the area of Keeler and Steele Streets in the City of Detroit. Trans. at 8, 39. The officers had received intelligence that the shooter was likely to be found at 15400 Steele. Id. at 39–40. Approaching

1

the suspected residence of a shooter, the officers were conscious of potential risks to their own safety and the safety of the public. Id. at 9, 40.

The officers observed Mims in front of 15400 Steele, though Mims argues that the officers' accounts of their initial observations of Mims are contradictory. Mims Suppl. Br. at 3–4. Lord testified that he saw Mims "walking out" of the residence; he then clarified that he first observed Mims "at the sidewalk approaching that grassy area in between the street and the sidewalk." Trans. at 11. James testified that he first observed Mims "stepping down from the steps" of the porch at the residence, id. at 50, which he estimated was about 15 or 20 feet from the sidewalk, id. at 52.

Both officers observed that an extended magazine for a handgun protruded from Mims's right pants' pocket, and Lord stated, "he's got a gun." Id. at 46–47, 50. Both officers testified that the presence of an armed individual at the suspected residence of a shooter implicated concerns for their safety. Id. at 9, 42.[1] The officers were also conscious that an extended magazine allowed Mims to shoot off numerous rounds—more rounds than the officers were capable of firing with their department-issued firearms. Id. at 17–18, 42. Lord observed that Mims had a "surprised" look on his face and that he attempted to "blade" his body towards a parked vehicle in an apparent effort to conceal the firearm. Id. at 11, 20.

Making an effort to "respond[] quickly" to limit Mims's potential response time, Lord placed the police vehicle in park, exited the vehicle, and approached Mims with the intent of "getting at least close to that individual so that [Lord] could respond to . . . any action that

---

[1] The Government does not argue that Mims was in fact the suspect in the shooting to which the officers were responding, nor that Lord and James believed Mims to be this suspect. During the evidentiary hearing, Lord suggested that the officers held this belief at a certain time, testifying that he alerted other officers that "the individual we were looking for [in regard to] that shooting gun-related crime was actually at the location standing outside." Id. at 23. However, footage from James's body camera following the seizure suggests that (at least by that time) the officers believed Mims was not the suspected shooter; James recounted to his superior that "another guy was walking down the steps" with a magazine, see James Body Camera at 4:35–4:42 (emphasis added), implying that Mims was distinct from the other individual whom the officers were seeking.

individual took." Id. at 18–19.  Within "mere seconds," Lord had removed the firearm from Mims's pocket.  Id. at 21.  The officers also handcuffed Mims.  Id. at 22.  "[S]imultaneously" with recovering Mims's firearm—while "in motion" to approach him—Lord asked Mims if he had a concealed pistol license (CPL), and Mims responded, "no."  Id. at 21–22.  James provided cover for Lord while Lord recovered the firearm.  Id. at 47.

Mims tries to cast doubt on Lord's account regarding the timing of these events.  Mims Suppl. Br. at 2.  He points to Lord's testimony that he was "moving extremely quickly" to reach Mims, and that it was a "possibility" that he could cover the distance to Mims before he was able to ask if Mims had a CPL.  Trans. at 34–35.  Mims argues that if Lord had time to ask about a CPL and receive an answer, then Lord had time to activate his body camera; however, Lord did not do so.  Mims Suppl. Br. at 5.

Lord testified that DPD officers are required to activate their cameras during all encounters with citizens.  Trans. at 31.  Neither Lord nor James was wearing an active body camera when the officers confronted Mims.  Lord testified that he did not activate his body camera because the situation called for him to approach Mims quickly and safety was his number one concern.  Id. at 19.  James testified that he had forgotten to put his body camera back on his person after taking it off earlier to use the bathroom.  Id. at 45.  Each officer's body camera, however, was activated after the arrest and captured certain subsequent events.[2]  Lord's body camera captured Lord's explanation of his encounter with Mims to other responding officers:

> He came out, saw us, and tried to dip behind the car.  I just happened to glance over and see the freaking end of the mag sticking out of his pocket.  I said, "what you doing," he was like, "nothing."  I said, "you got a CPL?" and he was like, "no."

---

[2] These cameras are activated when the wearer self-activates the camera by pressing a button on the camera, when the patrol car's emergency lights are activated, or when the rear door of the patrol car is opened.  Trans. at 13.

3

Lord Body Camera at 6:30–7:02.

James's body camera captured his explanation of the event to his superior over the radio: "another guy was walking down the steps and he was on the sidewalk and he had an extended mag poking out of his pocket so we got CCW out of it as well." James Body Camera at 4:35–4:42.[3]

The officers determined that the firearm recovered from Mims had been stolen. Gov. Suppl. Br. at 6. Mims admitted to the officers that he had a felony conviction for carjacking. Lord Body Camera at 2:45–2:49; James Body Camera at 3:07–3:10. The Government determined that Mims was on parole for the carjacking offense at the time of this incident. Gov. Suppl. Br. at 7. Because Mims had been convicted of a crime punishable by imprisonment for a term exceeding one year, it was unlawful for him to possess a firearm. See 18 U.S.C. § 922.

## II. ANALYSIS

The Government bears the burden of demonstrating that exigent circumstances exist to justify a warrantless search and seizure. United States v. Pollard, 215 F.3d 643, 648 (6th Cir. 2000). The Fourth Amendment "permit[s] a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry v. Ohio, 392 U.S. 1, 27 (1968). Under Terry, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989).

---

[3] "CCW" may refer to the crime of "carrying a concealed weapon" without a license; it may also refer to a "concealed-carry weapon permit," see Northrup v. City of Toledo Police Dep't, 785 F.3d 1128, 1130 (6th Cir. 2015).

4

Courts in this circuit engage in a two-step analysis to evaluate the constitutionality of an investigatory Terry stop. United States v. Beauchamp, 659 F.3d 560, 569 (6th Cir. 2011). Courts first "consider whether there was a proper basis for the stop"; under this inquiry, "the officer must have reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity . . . based on specific, objective facts." Id. (punctuation modified). In other words, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 411–412 (1981). Courts then "consider whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Beauchamp, 659 F.3d at 569 (punctuation modified).

The parties do not dispute the second step of the inquiry—that the officers used a reasonable degree of intrusion when they physically seized the firearm from Mims's person. So the question before the Court turns on the first inquiry: whether the officers had a reasonable suspicion that Mims was armed and dangerous or that Mims was involved with criminal activity. Terry, 392 U.S. at 27; Beauchamp, 659 F.3d at 569.

The Court finds that the totality of the circumstances confronting Lord and James provided a particularized and objective basis for their suspicions both that Mims was armed and dangerous such that a search was justified for the officers' own protection, Terry, 392 U.S. at 27, and that criminal activity was afoot, Sokolow, 490 U.S. at 7. The officers were present at 15400 Steele on suspicion of a suspected shooting, and so it is understandable that they were conscious of risks to their own safety. See Trans. at 9, 40. Mims emerged from the very residence where the officers were told they might find the suspected shooter. Id. at 39–40. Mims carried a weapon capable of firing more rounds than the firearms held by the officers, creating a substantial risk to their safety

5

in the event of a shoot-out. Id. at 17–18, 42. Mims acted suspiciously; he was surprised at the officers' presence and tried to conceal the firearm by turning his body away from the officers. Id. at 11, 20.

The fact that Mims was carrying a firearm presented a formidable reason for the officers to suspect that he was involved in criminal activity because carrying a firearm is presumptively illegal in Michigan. Under Michigan law, a defendant accused of illegally carrying a concealed weapon has the burden of producing evidence that he or she is licensed. See People v. Henderson, 218 N.W.2d 2, 4 (Mich. 1974) (placing burden of producing evidence of licensure on defendant who was found carrying pistol in a vehicle, only after which the prosecution was required to establish the contrary beyond a reasonable doubt); People v. Perkins, 703 N.W.2d 448, 450 (Mich. 2005) (placing burden on defendant to produce evidence that his gun rights had been restored and, because he failed to do so, not requiring prosecution to prove the absence of restored gun rights beyond a reasonable doubt). Michigan law also requires that an individual carrying a firearm keep the CPL on his or her person and produce the CPL when requested to do so by an officer. Mich. Comp. L. § 28.425f.

For this reason, courts interpreting Michigan law have found that an officer's observation of a firearm in a vehicle is sufficient evidence of criminality to justify a seizure. See, e.g., United States v. Galaviz, 645 F.3d 347, 356–357 (6th Cir. 2011) (affirming the district court's denial of defendant's motion to suppress a warrantless seizure of a gun from the defendant's vehicle because "[i]n Michigan, it is a crime to carry a pistol in a vehicle without a firearm license," and, therefore, the handgun's incriminating nature was apparent under the plain view doctrine, and the firearm provided probable cause of evidence of a crime under the automobile exception) (citing Mich. Comp. L. § 750.227); United States v. Williams, 483 F. App'x 21, 27 (6th Cir. 2012) (finding that officers' seizure of a firearm was based on a reasonable suspicion of criminality because Michigan

6

law—which "make[s] it a crime to carry a pistol 'concealed or otherwise, in a vehicle operated or occupied by' the carrier"—establishes that "merely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful") (quoting Mich. Comp. L. § 750.227(2)). The same law applies on the street: "[a] person shall not carry a pistol concealed on or about his or her person, or, whether concealed or otherwise, in a vehicle operated or occupied by the person . . . without a license to carry the pistol." Mich. Comp. L. § 750.227(2) (emphasis added).

Mims attempts to distinguish the illegality of carrying a firearm in a vehicle and the illegality of carrying a firearm on one's person, but his only basis for doing so is that the Michigan Legislature established different statutes with different standards for the two crimes. Mims Suppl. Br. at 7 (citing Mich. Comp. L. § 750.227d) (disallowing a firearm in a vehicle unless the firearm is unloaded and inaccessible in certain enumerated ways). However, the statutory framework is not so compartmentalized. Galaviz and Williams both cite § 750.227, which criminalizes the unlicensed carrying of firearms in both circumstances. Mims was just as bound by the requirements of § 750.227 as the suspects in those two cases.

Mims also cites various cases that found that an officer's observation of a firearm was insufficient for a presumption of criminal activity, see Mims Suppl. Br. at 6; but these cases do not interpret Michigan law, see United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013) (finding that seizure of firearm was unreasonable in part because under North Carolina law the firearm was "legally possessed and displayed"); Northrup, 785 F.3d 1128 at 1131 (finding that officer did not have a reasonable basis to seize a pedestrian's handgun under Terry because Ohio not only "made open carry of a firearm legal, but it also does not require gun owners to produce or even carry their

7

licenses for inquiring officers"). These analyses are of no value for assessing suspicions of criminality in a state where carrying a firearm is presumptively illegal.

Mims also raises United States v. Floyd, a case in which the court granted the defendant's motion to suppress evidence of a firearm seized from his person where the seizing officers had no information regarding potential criminality activity; they merely "saw an individual exiting a liquor store with his purchase, and an inch of an extended magazine" on his body. Case No. 21-cr-20010 at 2–4 (E.D. Mich. July 6, 2021) (Dkt. 27). The Floyd court distinguished Terry because the Terry suspect "acted suspiciously," id. at 3, and the same distinction applies in the case of Mims. Lord and James were not seizing firearms from random citizens in public stores. They had reason to believe that individuals at the site of the encounter were engaged in dangerous and criminal activity, and they identified an armed individual who seemed to be attempting to hide his weapon. Lord testified that he acted quickly to disarm that individual out of a concern for his own safety. Trans. at 18–19. These circumstances are less like Floyd than they are like Terry. See Terry, 392 U.S. at 30 (finding that officer reasonably suspected that individuals posed a threat to the officer's safety where they repeatedly walked up to and away from a store window and where the officer feared they were armed).

Mims's primary argument in response to accusations that Mims acted suspiciously is that Lord and James are not credible witnesses. Mims Suppl. Br. at 3–5, 5 n.1. Mims points to apparent contradictions between James's and Lord's accounts, as well as ambiguity in Lord's testimony regarding the sequence of events relating to the seizure. These points do little to discredit the officers. Lord testified he first saw Mims on the sidewalk, Trans. at 11, while James said he first saw Mims emerge from the residence about 15 or 20 feet away from the sidewalk, id. at 50. This minor discrepancy does not diminish the credibility of two officers who observed a potential danger and acted quickly to confront it. Lord—a 12-year veteran of the police force, see Mims

8

Suppl. Br. at 3—was consistent in reporting that he acted quickly and executed multiple actions simultaneously to neutralize a potential danger, Trans. at 18–20. The Court has no reason to disbelieve him. It is unfortunate that the officers did not activate their body cameras, but their explanations—the need to act with speed and the human error of forgetting to reequip after using the bathroom—are understandable. No less, the officers' testimony is consistent with their accounts of the encounter with Mims captured by their body cameras in the immediate aftermath of the seizure. See Lord Body Camera at 6:30–7:02; James Body Camera at 4:35–4:42.

The officers suspected that Mims was armed and dangerous and involved in criminal activity based not only on his possession of a presumptively illegal firearm, but also on Mims's suspicious behavior at a location suspected to hold individuals involved in an illegal shooting. The officers thus had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 411–12. They also had a reasonable basis to believe he was "armed and dangerous." Terry, 392 U.S. at 27.

### III. CONCLUSION

For the above reasons, the Court denies Mims's motion to suppress (Dkt. 45).

SO ORDERED.

Dated: December 21, 2021　　　　　　　　　　s/Mark A. Goldsmith
　　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　United States District Judge